# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| LYNTRICE STRAUSS, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION H-08-1895 |
| | § | |
| JOHN E. POTTER, *Postmaster General* | § | |
| *United States Postal Service,* | § | |
| | § | |
| *Defendant.* | § | |

## MEMORANDUM AND ORDER

Pending before the court is defendant John E. Potter's motion for summary judgment.  Dkt. 20.  After review of the motion, the response, reply, sur-reply, and the applicable law, the  motion is GRANTED.

## BACKGROUND

Plaintiff Lyntrice Strauss ("Strauss" or "plaintiff") is an employee of the United States Postal Service ("USPS"), and is currently a Parcel Post Distribution Clerk in Houston, Texas.  Strauss suffered a back injury at work on November 25, 2005, and since that time has been limited in her ability to carry, kneel, bend or stoop, twist, pull or push, grasp, manipulate and reach above her shoulder.  Dkt. 20-11.  Strauss was provided a modified assignment as "primary clerk" on February 1, 2006, and as a "clerk" on March 2, 2007.  Dkts. 20-13.  Both of these jobs were paid at "level 5" and involved limitations on lifting to 5-10 pounds and only "intermittent" pushing and pulling.  *Id*. On March 9, 2007, Strauss was also given a temporary assignment for "approximately" 90 days beginning March 17, 2007, that was terminated on May 20, 2007, in "Priority/Registry."  She then returned to her previous assignment.  It was while Strauss occupied these positions that the actions giving rise to this Title VII discrimination/retaliation/hostile work environment case occurred.

Plaintiff alleges the following acts of discrimination based upon race (African-American), sex, disability (back injury), and retaliation for having filed a prior Equal Employment Opportunity ("EEO") complaint: (1) she was given a job on 2/7/07 and that job was taken away from her by the acting supervisor; (2) on 5/19/07 a detail with a greater rate of pay (level 6) scheduled to last 90 days was cancelled; and (3) on 8/9/07 plaintiff was prohibited from working a level 6 job. Dkt. 6. Plaintiff also alleges that she was subjected to sexual harassment constituting a hostile work environment by Richard Melchor, one of her supervisors, and that the harassment allegedly made her ill. *Id*. The specific instances of alleged misconduct by Melchor will be set forth with more particularity as those instances are relevant to the court's analysis of the pending motion.

Following the alleged discriminatory practices, and two Equal Employment Opportunity ("EEO") proceedings, Strauss continued her employment as a level 5 clerk until February 16, 2008, when she received a pay increase to level 6. Dkt. 20-15. Strauss presently occupies that same position and pay grade.

Defendant Strauss filed a motion summary judgment. Dkt. 20. Plaintiff has responded, and further briefing has occurred. Dkts. 27, 28, 31, 32, 33. The motion is now ripe.

## ANALYSIS

### A. Summary Judgment Standard

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56©); *see also Carrizales v. State Farm Lloyds*, 518 F.3d 343, 345 (5th Cir. 2008). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; there must be an absence of any genuine issue of material

fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S. Ct. 2505 (1986). An issue is "material" if its resolution could affect the outcome of the action. *Burrell v. Dr. Pepper/Seven Up Bottling Group, Inc.*, 482 F.3d 408, 411 (5th Cir. 2007). "[A]nd a fact is genuinely in dispute only if a reasonable jury could return a verdict for the non-moving party." *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006).

The moving party bears the initial burden of informing the court of all evidence demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986). Only when the moving party has discharged this initial burden does the burden shift to the non-moving party to demonstrate that there is a genuine issue of material fact. *Id.* at 322. If the moving party fails to meet this burden, then it is not entitled to summary judgment and no defense to the motion is required. *Id*.

"For any matter on which the non-movant would bear the burden of proof at trial . . . , the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718–19 (5th Cir. 1995); *see also Celotex*, 477 U.S. at 323–25. To prevent summary judgment, "the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348 (1986) (quoting FED. R. CIV. P. 56(e)).

When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-movant and draw all justifiable inferences in favor of the non-movant. *Envtl. Conservation Org. v. City of Dallas, Tex.*, 529 F.3d 519, 524 (5th Cir. 2008). The court must review all of the evidence in the record, but make no credibility determinations or

3

weigh any evidence; disregard all evidence favorable to the moving party that the jury is not required to believe; and give credence to the evidence favoring the nonmoving party as well as to the evidence supporting the moving party that is uncontradicted and unimpeached. *Moore v. Willis Ind. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000). However, the non-movant cannot avoid summary judgment simply by presenting "conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation." *See TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). By the same token, the moving party will not meet its burden of proof based on conclusory "bald assertions of ultimate facts." *Gossett v. Du-Ra-Kel Corp.*, 569 F.2d 869, 872 (5th Cir. 1978); *see also Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1221 (5th Cir. 1985).

## B. Discrimination and Retaliation

### 1. Legal Standard

Title VII of the Civil Rights Act of 1964 ("Title VII") makes it unlawful for an employer to discharge an employee because of her "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). A plaintiff can prove intentional discrimination through either direct or circumstantial evidence. *See Urbano v. Continental Airlines Inc.*, 138 F.3d 204, 206 (5th Cir. 1998). Direct evidence is evidence which, if believed, proves the fact without inference or presumption. *Jones v. Robinson Prop. Group, L.P.*, 427 F.3d 987, 992 (5th Cir. 2005) (citing *Brown v. E. Miss. Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir.1993)). When a plaintiff offers only circumstantial evidence, the *McDonnell Douglas* framework requires the plaintiff to establish a *prima facie* case of discrimination, which, if established, raises a presumption of discrimination. *See Rutherford v. Harris County, Tex.*, 197 F.3d 173, 179–80 (5th Cir. 1999) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S. Ct. 1817 (1973)). To establish a *prima facie* case, the plaintiff

4

must show that "(1) she is a member of a protected class, (2) she was qualified for her position, (3) she suffered an adverse employment action, and (4) others similarly situated were more favorably treated" or the plaintiff was replaced by a non-minority.  *Willis v. Coca Cola Enters., Inc.*, 445 F.3d 413, 420 (5th Cir. 2006) (quoting *Rutherford*, 197 F.3d at 184); *Jatoi v. Hurst-Eules-Bedford Hosp. Auth.*, 807 F.2d 1214, 1219 (5th Cir. 1987)).

If the plaintiff successfully establishes a *prima facie* case of discrimination, the employer must then produce a legitimate nondiscriminatory reason for its adverse employment decision.  *Id.* Once the employer produces a legitimate nondiscriminatory reason, the presumption of discrimination dissipates and the burden shifts back to the plaintiff-employee to raise a genuine issue of material fact that the nondiscriminatory reason is merely pretextual in order to survive summary judgment.  *Id.*  To carry this burden, the plaintiff must produce substantial evidence indicating that the proffered legitimate nondiscriminatory reason is a pretext for discrimination.  *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004).  A plaintiff may establish pretext by showing either (1) the reason offered by the employer is untrue, or (2) the reason is true, but the plaintiff's protected characteristic was a motivating factor in the adverse decision (the "mixed-motives" alternative).  *Id.*; *Keelan v. Majestco Software, Inc.*, 407 F.3d 332, 341 (5th Cir. 2005).  The plaintiff bears the ultimate burden of persuading the trier of fact, by a preponderance of the evidence, that the employer intentionally discriminated against her because of her protected status.  *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 219–20 (5th Cir. 2001).

Title VII's anti-retaliation provision protects an employee who is discriminated against because she has "'opposed' a practice that Title VII forbids or has 'made a charge, testified, assisted, or participated in' a Title VII 'investigation, proceeding, or hearing.'"  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59, 126 S. Ct. 2405 (2006) (quoting  42 U.S.C. § 2000e-3(a)).  To

establish a *prima facie* case of retaliation, a plaintiff must show: (1) she engaged in protected activity; (2) she was subjected to an adverse employment action; and (3) a casual link existed between the protected activity and the adverse employment action. *Banks v. E. Baton Rouge Parish Sch. Bd.*, 320 F.3d 570, 575 (5th Cir. 1997).  At a minimum, "in order to establish the causation prong of a retaliation claim, the employee should demonstrate that the employer knew about the employee's protected activity." *Manning v. Chevron Chem. Co., LLC*, 332 F.3d 874, 883 (5th Cir. 2003) (citing *Medine v. Ramsey Steel Co.*, 238 F.3d 674, 684 (5th Cir. 2001)).  If the plaintiff makes a *prima facie* showing of retaliation, the burden of production shifts to the employer, which must "articulate a legitimate, nondiscriminatory or nonretaliatory reason for its employment action." *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007).  "If the employer meets its burden of production, the plaintiff then bears the ultimate burden of proving that the employer's proffered reason is not true but instead is a pretext for the real discriminatory or retaliatory purpose. . . . To carry this burden, the plaintiff must rebut each nondiscriminatory or nonretaliatory reason articulated by the employer." *Id.*

To establish a *prima facie* case of disability discrimination, a plaintiff must show (1) she is disabled or is regarded as disabled; (2) she is qualified for the job; (3) she was subjected to an adverse employment action on account of her disability; and (4) she was replaced by or treated less favorably than non-disabled employees. *Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 511 (5th Cir. 2003).  The same burden-shifting analysis set forth above also applies to claims under the Rehabilitation Act for disability discrimination. *EEOC v. Chevron Phillips*, 570 F.3d 606, 615 (5th Cir. 2009).

2.      **Analysis.**

Defendant Potter does not, for purposes of the motion for summary judgment, challenge the existence of a *prima facie* case of discrimination or retaliation with respect to Strauss's alleged specific instances of adverse employment actions.  Rather, defendant argues that, with respect to each alleged adverse employment action, there was a legitimate, non-discriminatory reason, that plaintiff cannot establish was pretext for discrimination or retaliation.  Specifically, defendant asserts that the positions at issue were, in each instance, beyond Strauss's physical limitations as established by her medical records, and by the limitations set forth in the limited-duty position created by the USPS as an accommodation for Strauss.

a.      **February 7, 2007 - removal from a job.**

Plaintiff asserts that she was asked by one of her supervisors, Miguel Arispe, to speak with supervisor George Hackett to ask if she could work with him as "overseer of empty equipment" on February 7,2007, but that Melchor denied her this assignment.  Melchor and Arispe testified that this was not an official position, but was a project to clean up the dock area, that the project was not, ultimately, given to any other employee.  Dkt. 20-22 at 1, 7.  Further, this job involved pushing and pulling that Melchor and Arispe believed would exceed Strauss's established limitations of lifting no more than 10 pounds and only intermittent pushing and pulling.  *Id*.  Defendant has, therefore, identified a legitimate, nondiscriminatory reason for the action.

The burden has now shifted to Strauss to establish, through competent summary judgment evidence, a fact issue about whether: (1) the reason is not true, but is instead a pretext for discrimination; or (2) the reason, while true, was only part of the reason for the actions, and discrimination was a motivating factor.  *Rachid v. Jack in the Box, Inc.*, 376 F.3d at 312.

Strauss states in her affidavit that the jobs she was assigned were "within [her] medical restrictions" (Dkt. 27-1 at 3), but concedes she was limited to lifting no more than 10 pounds, and to pushing and pulling the same weight "intermittently" during an 8-hour day. Dkt. 20-11.[1] Strauss offers no specific facts concerning what her duties would have been as overseer of empty equipment, nor does she specifically contest Melchor's and Arispe's statements that the job would have involved pushing, pulling and lifting that would have exceeded her medical restrictions. Strauss could easily have described the duties she believed would be involved, and could have thereby offered some relevant evidence in this respect, but she has not. Strauss cannot meet her burden in a summary judgment setting by simply saying, in effect, "not so."

Therefore, Strauss has not presented any evidence of pretext beyond her disagreement with the reasons offered by defendant. "Simply disputing the underlying facts of an employer's decision is not sufficient to create an issue of pretext." *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 391 (5th Cir. 2007); see also *Mire v. Texas Plumbing Supply Co., Inc.*, 286 Fed. App'x. 138, 143-44 (5th Cir. 2008) (unpublished) (per curiam) (plaintiff's subjective belief that she was right and defendant was wrong, without more, is insufficient to rebut defendant's reasons for the disciplinary action). If the assignment did not involve specific activities that exceeded her limitations, Strauss could have and should have offered specific evidence concerning this issue. Her failure to do so is also a failure to meet her burden. Defendant has presented a legitimate, nondiscriminatory reason for the action in question, and plaintiff has presented no evidence that the reason was pretext for discrimination.

---

[1]     Both parties list Strauss's ability to lift as being limited to "5-30 pounds" in their briefing, but the record is clear that this limitation is, in fact, 5-10 pounds. Dkts. 11, 14.

**b.      May 19, 2007 - removed from detail to last 90 days.**

Plaintiff bid upon, was awarded, and worked for two months in a temporary position in the "Registry Unit" where she was paid at a higher grade than the limited duty position she normally worked. Dkt. 14. On May 19, 2007, the temporary position was terminated by supervisor Alan Brem who states in an affidavit that he terminated the assignment because it was brought to his attention that the requirements exceeded plaintiff's limitations. Dkt. 20-23 at 3. More specifically, Brem noted that plaintiff's limitations of lifting and carrying no more than 10 pounds intermittently was "below the performance capabilities of persons in this assignment." Dkt. 20-23 at 3. Plaintiff argues that Brem's assertion that the restrictions on her ability to perform work tasks are merely a pretext for retaliation because she had just filed her second EEO complaint when she received notice that the temporary assignment had been terminated. However, Jerry Clark, who investigated plaintiff's first EEO complaint, noted during his interview with Strauss in April, 2007 that her assignment to the Registry Unit would require "lifting, stooping, bending and pushing loaded equipment" and appeared to be beyond her restrictions. Dkt. 20-24 at 8. Thus, concern about plaintiff's limitations was noted by supervisory personnel prior to the time she filed her second EEO complaint in May, 2007.

Again, plaintiff admits her physical limitations, and she does not specifically contest that those restrictions conflict with her assignment to the Registry Unit. Plaintiff has not presented any evidence that Brem was motivated by any improper considerations, other than to note the temporal proximity of his decision with the filing of her second EEO complaint. While this is certainly a relevant consideration, Strauss has offered no evidence that she, in fact, could perform the requirements of the position. Therefore, Brem's explanation that his decision was based on his own

9

knowledge of the position's requirements, and plaintiff's conceded physical limitations, is a nondiscriminatory reason that has not been rebutted.

Indeed, it is inconsistent for plaintiff to admit having limitations arising from her back injury, accept limited duty positions as an accommodation for those limitations, and then claim discrimination when the USPS acts in accordance with those conceded limitations. This is not discrimination – it is lawful, required accommodation. If plaintiff does not believe she still suffers from physical limitations, she can certainly indicate to the USPS that her circumstances have changed and that she no longer suffers from those limitations.

### c.   August 9, 2007 - prohibited from working level 6 job.

Amitra Arceneaux is the supervisor who asked Strauss to work as an "Expediter" on August 9, 2007. Dkt. 20-21 at 4. Another supervisor, Clarence Woods, informed Arceneaux that the assignment was beyond Strauss's physical limitations. *Id.* Plaintiff asserts that this was retaliation for her EEO complaint, and that Woods told her to "wait until this EEO stuff" is over before she can work such assignments. Arceneaux did not recall such a comment, and Woods denies making it. *Id.* at 2, 5. Again, however, plaintiff does not offer any specific refutation of the reason given. She does not detail the work she would have had to do as an expediter, nor has she offered any other evidence that the job would be within her admitted physical limitations. Summary judgment is appropriate on this claim because plaintiff has not met her burden of refuting the legitimate, nondiscriminatory reason for the action.[2]

---

[2]   And, in any event, the undisputed record is that plaintiff was paid at the higher pay grade for her work on August 9, 2007. Therefore, she failed to set forth a *prima facie* case because she has not shown an adverse employment action.

10

**C. Hostile Work Environment Claim**

The United States Supreme Court noted in *Harris v. Forklift Systems, Inc.* that "when discriminatory conduct [is] so severe or pervasive that it create[s] a work environment abusive to employees because of their race, gender, religion, or national origin," the broad notions of Title VII are offended.  510 U.S. 17, 22, 114 S. Ct. 367 (1993).  An employee establishes a *prima facie* case of hostile work environment by showing that (1) she belongs to a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based on sex; and (4) the harassment affected a term, condition, or privilege of her employment.  *Lauderdale v. Tex. Dep't of Criminal Justice*, 512 F.3d 157, 163 (5th Cir. 2007).  "For harassment to affect a 'term, condition, or privilege of employment' it must be 'sufficiently severe or pervasive so as to alter the conditions of employment and create an abusive working environment.'"  *Celestine v. Petroleos de Venez, SA*, 266 F.3d 343, 353 (5th Cir. 2001) (quoting *Watts v. Kroger Co.*, 170 F.3d 505, 509-10 (5th Cir. 1999)).  "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances."  *Harris*, 510 U.S. at 23.  The "environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim did in fact perceive to be so."  *Faragher v. Boca Raton*, 524 U.S. 775, 786, 118 S. Ct. 2275 (1998).  "An egregious, yet isolated, incident can alter the terms, conditions, or privileges of employment and satisfy the fourth element necessary to constitute hostile work environment."  *Lauderdale*, 512 F.3d at 163.  However, "[i]ncidental, occasional or merely playful sexual utterances will rarely poison the employee's working conditions to the extent demanded for liability.  Discourtesy or rudeness, 'offhand comments and isolated incidents (unless extremely serious) will not amount to discriminatory changes in terms and conditions of employment.'"  *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 264 (5th Cir. 1999) (quoting *Faragher*, 524 U.S. at 786).

11

As a threshold matter, Potter seeks summary judgment on the affirmative defense that Strauss's harassment/hostile work environment claim is outside the scope of her EEOC charge and, therefore, that she failed to exhaust administrative remedies as to that claim.  However, "consistent with the remedial purposes of the ADA, a charge of employment discrimination must be construed with the 'utmost liberality.'"  *Price v. Sw. Bell Tel. Co.*, 687 F.2d 74, 78 (5th Cir. 1982) (citing *Terrell v. U.S. Pipe & Foundry Co.*, 644 F.2d 1112 (5th Cir. 1981)).  Construing Strauss's EEO charge with the "utmost liberality," her references to harassment by Melchor during the EEO proceedings are sufficient to raise a claim for hostile work environment, and Strauss successfully exhausted her administrative remedies as to that claim.  *Id.*

On the merits, Strauss alleges the following instances supporting her claim that she was subjected to a hostile work environment due to her sex and race:

> (1)     Melchor made comments to plaintiff sometime in July, August or September, 2006, that were "degrading, negative, and intimidating" including that he had a list of women that he slept with and that plaintiff was next on the list, that he would make her work under him so he could "keep tabs" on her, that he would put her off the clock, and would "put a stop" to her doing different jobs.
>
> (2)     Plaintiff represented another employee as a union steward, and Melchor said he was going to get the other employee's "ass" because he was angry that plaintiff succeeded in having the discipline imposed by Melchor reversed.
>
> (3)     In July or August, 2006, Melchor removed Strauss from the dock when Strauss noticed an error and a truck was delayed. Melchor was angry that Strauss would not falsify a document to reflect that the truck left on time.  Melchor proceeded to "yank" her around from the dock to another work area "like a yo-yo" even though he was not technically her supervisor that day.
>
> (4)     On another occasion, Melchor again removed plaintiff from the dock and sent her to the machines, even though it was not a limited duty job, because she was doing too good a job of discovering errors made by others.

12

(5)     In December, 2006 or January, 2007, Melchor again became upset by Strauss pointing out problems on the dock and told her, "Don't worry, you are coming off the dock."

(6)     On January 31, 2007, Strauss was taking paperwork to the transfer office when Melchor was there.  Melchor asked her what door she was working, and Strauss told him door 12.  Melchor then said, "Oh, I'm going to put a stop to that shit, I'm in charge."

(7)     On February 2, 2007, Melchor telephoned Strauss while she was in the transfer office and asked her in a very unprofessional and rude way about a revised schedule Strauss had requested.  Melchor became upset and began to scream and curse at Strauss.  Strauss warned Melchor to stop screaming at her and then hung up the telephone.

(8)     On February 3, 2007, Melchor came to the dock, picked up a Departure of Vehicle sheet, and threw it back on the table.

(9)     On February 6, 2007, Melchor saw Strauss working in the registry cage.  He walked back and forth in front of the cage, and Strauss felt intimidated.

(10)    On February 7, 2007, Supervisor of Distribution Operations Sharon Crow told Strauss that Melchor wanted a pre-disciplinary meeting with Strauss because she was working on the dock, as instructed by Supervisor Bob Davis, when Melchor wanted Strauss working on the primary line.

(11)    Later in the day on February 7, 2007, Supervisor of Distribution Operations Miguel Arispe paged Strauss and told her to see another manager, George Hackett, to receive an assignment as "overseer of empty equipment," but Melchor found out and said "hell no, she will not be going anywhere."

(12)    Strauss began doing the assignment of overseer of empty equipment, and Melchor began to scream at her in a very unprofessional, rude and confrontational and intimidating tone of voice, and then told Strauss to go to the Attendance Control Office.  Strauss complied and waited for half an hour before she was instructed to go to work on the primary line.

(13)    On February 8, 2007, while Strauss was working on the primary line, supervisor Hammond paged her.  Hammond told Strauss that Melchor had checked with Hammond to see if Strauss was on the primary line.

13

(14)   Later on February 8, 2007, Strauss moved to work in registry per the request of Miguel Arispe.  Melchor passed by and looked at her in an intimidating manner.  Melchor later walked by and began to laugh and pointed and stared at Strauss.  Arispe and Hackett wanted Strauss to work on the dock and to do empty equipment.  Melchor wanted her close to him.  He had her moved back to the primary line.

(15)   At her deposition, Strauss testified that Melchor told her that he was "the man around here" and then said to Strauss, "Yeah, you're next on my list."  Strauss replied "You will never -read my lips" and then spelled out the work "N-E-V-E-R."  Melchor responded, "Never say never."

Dkt. 27 at 9-13.

As an initial matter, instances of harassment that are not based on sex or race must be identified and excluded from the analysis.  See, e.g., *Baker v. FedEx Ground Package Sys. Inc.*, 278 Fed.Appx. 322, 329 (5th Cir. 2008) (per curiam) (unpublished) ("The phrases 'fired girl walking' and 'stupid' are not 'based on race' and, thereby, do not sustain a race-based hostile work environment claim."); *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 583 (11th Cir. 2000), abrogated on other grounds by *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S.Ct. 2405 (2006) ( "Innocuous statements or conduct, or boorish ones that do not relate to the sex of the actor or of the offended party (the plaintiff), are not counted."); *Vallecillo v. U.S. Dept. of Housing & Urban Dev.*, 155 Fed.Appx. 764, 767-68 (5th Cir. 2005) (per curiam) (unpublished) (filtering out statements that were not based on race or national origin before determining whether the harassment was severe or pervasive).

Here, the only instances of harassment that arguably attributable to Strauss's membership in a protected group are the sexual harassment implicated in number 1 and 15 above.  Moreover, those two "incidents" appear to be the same, single incident where Melchor allegedly boasted of his prowess with other women, and then allegedly directed his interest at Strauss on a single occasion.

14

Strauss's own description of the conversation during her deposition, however, reflects that she rebuffed the advance she perceived, and that the matter was never raised again. Dkt. 32-1 at 5-12. Further, from Strauss's description of the exchange, both Melchor and Strauss's female co-worker who witnessed the discussion each laughed after plaintiff told Melchor, "Never"and then punctuated her comment by spelling the word. *Id.* at 8. Thus, from an objective viewpoint, neither Melchor nor Strauss's female co-worker appeared to take this as a serious matter. This is not the sort of extreme behavior that can support a finding of a hostile work environment. *Stewart v. Miss. Transp. Com'n*, 586 F.3d 321, 330 (5th Cir. 2009) (supervisor saying he and plaintiff should be "sweet" and telling her six times that he loved her, although unwanted and offensive, not sufficient to "destroy [plaintiff's] opportunity to succeed in the workplace.").

   As for the remaining 13 instances of alleged harassment, along with being irrelevant because they do not involve sex or race-based harassment, Strauss's own description of events establishes that Melchor's motivation was, in some instances, Strauss's job performance and not her race or sex. Items 2, 3, 4 and 5 involve instances where Melchor was, by Strauss's recounting of events, angry at Strauss for noticing errors from Melchor's area of supervision, or for doing "too good a job" of quality control. Likewise, items 6, 10, 11 and 14 involve Melchor redirecting Strauss from other positions to the primary line, which was her assignment. Even if other supervisors had pulled her off of the primary line to work in other areas, this evidence is equally consistent with plaintiff being caught in a dispute between supervisory personnel concerning Strauss's assignment as it is with any personal animus Melchor may have had, and these instances, again, bear no independent indicia of race or sex-based harassment.

   Thus, the only relevant allegations of harassment are the comments Melchor allegedly made to plaintiff concerning his liaisons with other female employees, and his single, rebuffed attempt to

proposition Strauss.  As noted above, these isolated comments are not sufficient to support a finding

that plaintiff was subjected to an objectively hostile work environment.  Further, and even though

it is not necessary, the court notes that considering **all** of the allegations of harassment, and accepting

plaintiff's description of same, she still has not set forth the type of repeated, extreme conduct that

would constitute a hostile work environment.  For example, in *McConathy v. Dr. Pepper/Seven-Up

Corp.*, 131 F.3d 558 (5th Cir. 1998), the Fifth Circuit found the alleged harassment neither severe

nor pervasive even though the plaintiff's supervisor was (1) unsupportive toward the plaintiff when

she needed several surgeries; (2) became angry and said she had "better get well this time" when the

plaintiff explained her need for additional surgery; (3) told the plaintiff he would no longer tolerate

her health problems; (4) complained about plaintiff's extensive use of the company's benefits;

(5) pressured the plaintiff to return to work before she recovered; (6) told plaintiff's co-workers to

cease communicating with the plaintiff; (7) transferred assignments away from the plaintiff; and

(8) refused to acknowledge the plaintiff's presence.  *Id.* at 563–64.  Here, plaintiff was subjected to

a single incident where Melchor made an (arguably) sexual suggestion, but Strauss's response did

not reveal that she had been intimidated, and the reaction of both Melchor and Strauss's female co-

worker (laughter at Strauss's emphatic response) reveals an atmosphere that is objectively more

consistent with teasing than it is with sexual harassment.  *Indest*, 164 F.3d at 264 (teasing comments

not sufficient to support harassment claim).  The remaining incidents are behavior that may be

considered rude or boorish, but are not even as severe as the collection of events set forth in

*McConathy*.  Therefore, defendant is entitled to summary judgment on the hostile work environment

claim whether or not all of the instances of alleged harassment are considered.[3]

---

[3]     And, of course, the court does not reach on a motion for summary judgment the underlying factual dispute of whether any of the other alleged instances of confrontations between Strauss and Melchor actually occurred as Strauss has described them.  Intead, the court, as it must,

## CONCLUSION

Upon consideration of the motion, the response, and the reply and sur-reply, as well as the applicable law, the motion for summary judgment filed by defendant Potter (Dkt. 20) is GRANTED.

Signed at Houston, Texas on March 31, 2011.

Gray H. Miller
United States District Judge

---

views the evidence in the light most favorable to Strauss. It is worth noting, however, that each of Strauss's factual assertions were contested during the EEO proceedings, and that other explanations for Strauss's difficult interactions with Melchor appear in the record. This includes a comment by a co-worker that Strauss didn't like Melchor because he made her stay on the primary line, and that this prevented her from sleeping while working. Dkt. 20-4 at 13. One EEO investigator, having noted a co-worker's comment about Strauss sleeping on the job, stated that Strauss kept "dozing off" during an interview conducted during working hours. Dkt. 20-24 at 7. Strauss, for her part, denies that she ever slept while working, but concedes that she probably fell asleep during her EEO interview due to her being tired and depressed, sitting without any activity for a period of time, and being on medication. Dkt. 27-1 at ¶ 34.